CHARLES URBAN, APPELLANT, V. JOSEPH M. NOVOTNY, APPELLEE.

FILED JANUARY 13, 1922. No. 21938.

Appeal: REVERSAL. Plaintiff brought an action to recover for personal injuries arising from an assault made upon him by defendant. The jury clearly disregarded the material facts in evidence and found for defendant. It follows that the verdict must be set aside.

Urban v. Novotny.

APPEAL from the district court for Valley county: EDWIN P. CLEMENTS, JUDGE. *Reversed.*

*Davis & Davis,* for appellant.

*Munn & Norman, contra.*

Heard before LETTON, DAY and DEAN, JJ., BLACKLEDGE and TEWELL, District Judges.

DEAN, J.

Plaintiff brought this action to recover for personal injuries resulting, as alleged, from an unprovoked assault by defendant. The verdict and judgment were for defendant, and plaintiff appealed.

The sole question before us is whether the verdict is supported by the evidence. A review of the record discloses substantially these facts: The altercation took place August 5, 1920, on a farm where plaintiff and defendant were assisting a neighbor to thresh. About the noon hour plaintiff remarked to defendant that a relative of his owed him a small sum of money for work performed for which he was never paid. That evening defendant, in the presence of some members of the threshing crew and before they left the field, took exceptions to plaintiff's statement about his relative and the assault followed.

It is clearly established that for several years before the assault plaintiff had been under treatment for a serious affection of the bones of his right arm and shoulder and that he had only a partial use of that arm. A physician testified that, about a year before the trial, upon examination, he found the bones of the arm were "rarefied, porous;" that "the humerus, upper arm, anchylosed to the scapula, that is, grown together, and giving him considerable pain at times."

With respect to the facts immediately attending the assault, plaintiff testified that the defendant approached him at about sundown and said he was "going to beat him up," or words to that effect, because of what he had

Urban v. Novotny.

said about his relative at the noon hour, and that he then seized him, knocked him down twice, and held him down and choked him and twisted his crippled arm and, while in this helpless position, he pressed one or both of his knees against his right side so that his ribs were almost fractured.   From the beating he said he became sick and his lungs bled.

Two or three eye-witnesses corroborated plaintiff's evidence.   One said that, after the beating, plaintiff was, seated and spitting blood, and that he never saw him do any work on his place after the injury, though he lived just across the road from him.   Another testified that defendant seized plaintiff's suspenders and his collar band and struck him, and when he fell he choked him and pressed on him with his knees and twisted his lame arm; that one of the threshing crew tried to loosen defendant's hold on plaintiff, "but he couldn't tear him off and he was lifting both from the ground."   Another testified that after the assault he assisted plaintiff to the farmhouse on the premises and that he was so weak he could hardly walk.   He said that plaintiff "was spitting blood right along," and that his handkerchief was covered with blood.

From the farmhouse plaintiff was removed that evening to a hospital at Ord, where he remained eight days. He was then taken to his home, where he was confined to his bed about a month.   From August 5, 1920, to the time of the trial in November, plaintiff was unable to do any work.   He was treated by two physicians at the hospital and for a considerable time by one or both of them after he returned to his home from the hospital.   The doctors said that he suffered such pain at times that he could not sleep and that, in order to obtain relief, it became necessary to administer anodynes.   The physician who examined plaintiff the evening of the assault found abrasions of the skin on the chest, blood-spitting and rales in the lungs and some effusion of serum or blood.   The bleeding was attributed to contusions on the chest.

At the hospital plaintiff's temperature increased about a degree and a half above normal and he suffered much pain for three or four weeks. The medical treatment continued until the time of the trial. It also appears from the evidence of one of the doctors that the soreness and abnormal condition of the patient would probably continue for several months so that he would be prevented from doing ordinary farm work. In his opinion the doctor said that the beating would be apt to bring on a recurrence of the trouble in the arm and that it could only be used with great care. The bills of two of the physicians approximated $75 each.

Defendant admitted that, before the altercation, he knew the crippled condition of plaintiff's right arm. He denied that he struck plaintiff, denied that he threw him down, and denied that he pressed him with his knees, but before the close of his testimony he made these material admissions: "Q. You had hold of him first by the shirt? A. Yes; between the suspenders, and he jerked loose. * * * Q. You grabbed him again? A. Yes. Q. And got him by the suspenders? A. Yes, sir. Q. He stumbled, you think, and fell? A. I don't know exactly how he come down. Q. You came down on top of him? A. I was on my feet aside of him, he was down and I on my feet aside of him holding him right along. * * * Q. And you held him down there? A. Yes." Defendant denied that he was on his knees. He said that plaintiff kicked at him, and that to protect himself he "kept this here knee right up against his foot," and that he had his knee by his side. He further testified: "Q. Well, he was down there quite a little while? A. I guess it was quite a while; I don't know how long it was. * * * Q. As a matter of fact before he fell down or before you pushed him down you held him up against the rack there? A. I guess there is where I got the second hold on him. Q. By the rack? A. By the rack. Q. That is what kept him from running off, you held him up against the rack? A. I guess so."

The separator tender, called on the part of defendant, testified that he was on top of the machine, and that defendant "kind of jumped at him (plaintiff) and grabbed another hold and throwed him to the ground and held him there some time, 10 or 15 minutes." Another witness, called by defendant, testified that defendant "grabbed for his (plaintiff's) suspenders and held him and tore his shirt;" that he "got him over towards the hayrack and held him there a little while and Charlie (plaintiff) went down and Joe stood right over him and held him down." He further said that one of the crew "tried to get Joe Novotny (defendant) to let him up and Joe wouldn't do it, or something, I don't know."

Defendant argues that plaintiff was the aggressor and made an attack on him, and that he used no more force than he believed was reasonably necessary to repel the attack and that all of his efforts were directed toward protecting himself from plaintiff's attempted assault. The evidence does not support the argument. The admissions of defendant, and the admissions in the testimony of his material witnesses, as shown herein, corroborate the evidence of plaintiff with respect to the assault. When considered altogether, the evidence clearly shows that plaintiff more than once tried to make an escape from one who was intent upon giving him a brutal beating and who had it in his power to do so. The evidence of defendant himself discloses that plaintiff "jerked loose," and that he again grabbed him and held him down "quite a while," and that he "got the second hold on him by the rack," and that it was the second hold which kept plaintiff from running away. That the attack upon plaintiff was the result of sudden passion cannot be successfully interposed. The commonplace remark, to which defendant took exception, was made at or about the noon hour and the assault did not take place until the sun was going down.

True, the direct testimony of nearly all of defendant's witnesses tends to corroborate the assertion of defendant

in his direct examination, namely, that he did not strike or beat the crippled plaintiff. But, as we have seen, the admissions by defendant himself and the admissions of the witnesses called by him, all on the cross-examination, plainly disclose the execution of a poorly concealed purpose to beat and bruise the plaintiff. It is strongly argued that the verdict of the jury should not be disturbed. But the elementary rule which defendant invokes is not applicable to the facts. The evidence of the three physicians is such that, when considered with all of the other evidence in the case, no other conclusion is permissible than that plaintiff was the victim of a superior brutal force from which he tried to escape.

For some reason that is undisclosed by the record the jury seem to have disregarded the evidence with respect to the material facts. The conclusion is that the judgment must be, and it hereby is, reversed and remanded for further proceedings.

REVERSED.